BENSON and others *vs.* THE MAYOR &C. OF THE CITY OF ALBANY, and ROBERT THOMPSON, chamberlain of said city.

The act of March 18, 1854, authorizing the loan of the credit of the city of Albany to the Northern Rail Road Company, was an exercise of the legitimate power of legislation.

The exercise of this power was not "adverse to the spirit" of the constitution, so as to authorize the judicial tribunals to declare the act void.

There is no prohibition in the constitution against the exercise of such a power by the legislature.

The remedy for the evils, if any, which grow out of grants of power to municipal corporations to loan their credit is not to be found in appeals to the judicial tribunals, but must be sought through other channels.

ON the 22d of April, 1857, the plaintiffs applied for a temporary injunction to restrain the defendants from paying the interest to become due on the 1st of May ensuing, on certain bonds issued by the corporation of the city of Albany, under an act of the legislature passed in March, 1854. The act in question authorized the mayor, aldermen, &c. of the city of Albany to loan the credit of the city, or to extend such aid as they should deem expedient, to the Albany Northern Rail Road Company, to an amount not exceeding $300,000, in such form and manner, and under such restrictions or conditions as the common council should prescribe. The act named commissioners to receive and apply the money for the purposes of the grant. Before the aid was given to the company, the commissioners were required to certify to the common council that such arrangements on the part of the company had been made,

as would, in their opinion, insure the performance of the conditions prescribed by the common council. The complaint alleged that, in pursuance of the authority thus given, the common council, in May, 1854, issued and delivered to the rail road company the bonds of the city, to the amount of $300,000. That the bonds were issued for the sole purpose of aiding the company in the construction of a rail road, *commencing in the city of Albany,* and extending north about thirty miles. That a mortgage was executed by the company to the city, to secure the payment of the bonds; that this mortgage was subject to two prior mortgages, exceeding in amount the whole value of the road; that the corporation of the city paid the semi-annual interest falling due upon the bonds in May and November, 1856; that the common council, in November last, directed their chamberlain to pay all the interest which should thereafter accrue and become due upon said bonds out of the city funds, and that he threatened to pay the interest which would become due on the first of May ensuing, unless restrained by an order of this court. The complaint further alleged that the plaintiffs were unable to state who were the owners or holders of the bonds, or of any of them, and therefore could not make them parties to the suit at that time. It also alleged that the issuing of the bonds was unauthorized by law, and that they were not obligatory upon the city, and that the common council had no right to order them, or the interest on them, to be paid out of the city funds. The plaintiffs prayed that the defendants might be perpetually enjoined from paying any part of said bonds, either principal or interest.

When the temporary injunction was applied for, an order was made requiring the defendants to show cause why it should not be granted. Copies of the order and of the complaint were served upon the defendants, but they did not appear, to show cause.

D. WRIGHT, J. The defendants having failed to appear and show cause, I was at first inclined to grant a temporary injunction. But when I reflected that not one of the bond holders, the only persons having an interest in the suit, hostile to the

plaintiffs, was made a party, and that the interests of the plaintiffs and defendants, for aught that appeared to the contrary, were in perfect harmony—that they were indeed identical—I did not feel at liberty to grant it without giving the case as thorough an examination, and as careful a consideration, as my limited time would permit. Having done this, I have come to the conclusion that I ought not to grant an injunction. I should with great reluctance grant an injunction in any case to restrain the payment of a debt contracted according to all the forms of law, unless the creditor was made a party to the suit; and more especially where, as in this case, the debt was of a public character, and its non-payment involved the question of a breach of the public faith.

The 118th section of the code, which is merely declarative of a long established and well settled principle of law, provides that "any person may be made a defendant, who has, or claims an interest in the controversy, *adverse* to the plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein." To prevent inconvenience in the prosecution or defense of suits, on account of the multiplicity of parties, the 119th section provides that, "where the parties are very numerous, one or more may sue, or defend, for the whole." That a "complete determination, or settlement of the question involved" in this suit cannot be made, until at least some of the bond holders, the only persons, "who have an interest in the controversy adverse to the plaintiffs," are made parties, is a proposition too plain to be controverted. It is manifest therefore, that the court will never grant a perpetual injunction to restrain the payment of the bonds in question, or the interest to grow due thereon, until some of the bond holders are made parties to the suit, and afforded an opportunity to be heard, before their claims are pronounced invalid.

I am not prepared to say that a case might not be presented in which a temporary injunction should be granted to restrain the agent of the plaintiff from paying over his funds to the creditors who claim them, although none of the creditors were made parties to the suit, because they were unknown to the

plaintiff, and could not after diligent inquiry be discovered, leaving the plaintiff to make them, or some of them, parties at a subsequent period, as I think he certainly must do before a final decision could be made. But this is not such a case : the plaintiffs do not allege that they have made any effort to ascertain the names of any of the bond holders, although the agents they now seek to restrain, paid the semi-annual interest which became due in May and November, 1856, out of the city funds, facts of which the plaintiffs can hardly be presumed to have been ignorant at the times they occurred, as they state in their complaint that they have been residents of the city for many years past, and it is difficult to resist the conclusion, that by the exercise of reasonable diligence, some of the bond holders might have been discovered in season to have been made parties to the suit at its commencement, and been afforded an opportunity to show cause why a temporary injunction should not be granted.

But I have felt compelled to deny the application on other grounds than an omission to make the proper persons parties to the suit. I could not, consistently with the conclusions at which I have arrived, have granted the injunction, if all the bond holders had been made parties. I was referred, by the plaintiffs' counsel, to the decision in the case of *Clark* v. *The City of Rochester*, as an authority showing that the act under which the bonds in question were issued was unconstitutional, and conferred no power upon the common council of the city of Albany to issue them. I regret that I have been compelled to examine and to form an opinion upon so delicate and grave a question, unaided by the light which the discussion of it by counsel, presenting the views of the parties whose interests are adverse, could not fail to have afforded. In the absence of such aid, I have read and considered that case with great care, and with all the respect due to the opinion of the learned judge by whom it was decided, but I have been unable to concur in its conclusions, so far as they affect this case.

In 1851, the legislature passed an act authorizing the city of Rochester to borrow $300,000, and to issue its bonds for that

sum, for the purpose of enabling the city to subscribe and pay for that amount of stock in the Genesee Valley Rail Road Company. Justice Allen held that the act conferring this authority upon the city of Rochester was unconstitutional, and that the bonds issued under it were invalid. If I understand the reasoning of the learned judge, he seeks to establish the unconstitutionality of the law upon the following grounds:

1st. "The *absence* of any express power conferred by the people in the constitution," upon the legislature to pass an act of such a character.

2d. That the "*assumption*" and exercise of such a power by the legislature "*is adverse to the spirit*" of the constitution.

3d. That the constitution "*expressly forbids* the legislature to grant the power which the act in question assumes to confer upon the common council of Rochester."

By section 1st of the 3d article of the constitution, "the legislative power of this state shall be vested in a senate and assembly." It would seem to be difficult, after such a grant, to maintain the first of the above propositions, if the power exercised by the legislature in reference to the city of Rochester, falls within the province of legislative action. All the sovereign power of the people of the state except what is expressly reserved in the constitution, is by that instrument conferred upon the executive, legislative and judicial departments of the government. It will not be denied, that if the power in question exists, it is vested in the legislative department. That it is a power, coming within the province of legislation if not prohibited by the constitution, is proved by the concurrent testimony of almost every legislature that has assembled within the state since the formation of the first constitution, and its exercise has become more and more frequent, as the unexampled growth of the state and prosperity of the people have increased the necessity for its exercise. The people, from all sections of the state, have petitioned the legislature from year to year, for grants of authority similar in principle to that conferred upon the city of Rochester, and the power of the legislature to make such grants has never, until very lately, been seriously questioned in this

state.   Not to allude to other instances, the city of Albany has, within a comparatively brief period, applied to and received from the legislature authority to extend pecuniary aid to no less than four different rail road companies, the Albany and West Stockbridge, the Albany and Schenectady, the Albany and Susquehanna, and the Albany Northern rail road companies. In three of these cases the city, through its municipal legislature, has acted upon the power conferred, and issued its bonds in pursuance thereof.

In the case of *The People* v. *The Mayor &c. of Brooklyn,* (4 *Comst.* 439,) Ruggles, J., says: "This system of taxation was in force at the time of the making and adoption of our first, second and third constitutions, and has stood in our statute books along with our constitutions, from 1777 until now. * * * If the *uniform practice* of the government from its origin, can settle any question of this nature, the power of the legislature to exercise this kind of taxation would seem to be established by it."   These observations are as pertinent to the case before me, as they were to the case in which they were made.   The cases are of a kindred character : both relate to the power of taxation.   Strong as is the argument derived from a long and unvarying practice in favor of the inherent power of the legislature to legislate upon the subject in question, its existence has also been recognized and sanctioned by the judicial tribunals of this, and I believe every other state in the union in which the question has been presented for adjudication.   Upon one or two occasions, within a few years past, this power has been questioned by some of the judges of our own state, previous to the decision of Justice Allen in the Rochester City case ; but I believe that in every such instance, upon a review in the court of appeals, the power has been recognized, and the constitutional right of the legislature to exercise it affirmed.

In 1834 the legislature passed an act authorizing the canal commissioners to change the eastern termination of the Chenango canal from Whitesborough to Utica, on receiving satisfactory security for the payment into the state treasury of a sum equal to the estimated increased expense to be occasioned by

the change.  Several citizens of Utica united in the execution of the required bond, and the proposed change was made.  To relieve the obligors from their liability on the bond, the legislature, in 1835, passed an act directing the sum of $41,000 to be assessed upon the owners of real estate in Utica, that being the sum required to pay the increased expense caused by the change.  The payment of this tax was resisted.  It was insisted that the act authorized the taking of the property of one class of citizens for the benefit of another class, and that it was unconstitutional.  Cowen, J., says, "the general purpose of raising the money by tax was to construct a canal, a public highway which the legislature believed would be a benefit to the city of Utica, as such; and independently of the bond, the case is the ordinary one of local taxation to make an improvement.  But it is said that if the act had in view the construction of the canal, then it was unconstitutional as seeking to take private property for public use, without just compensation.  To sustain this argument, it must be denied that the general profit of the community to which we belong, will warrant a tax affecting our property.  One answer is, that *the improvement in question was, in itself, a compensation to the plaintiff.*  Such. was the view taken by the legislature, and they must be left to judge of the compensation.  I admit, this power of taxation may be abused, *but its exercise cannot be judicially restrained so long as it is referable to the taxing power.*"  (*Thomas* v. *Leland,* 24  *Wend.* 65 )

The commissioners of highways of the town of Guilford, in the county of Chenango, by direction of the voters of the town, commenced and prosecuted a suit in their official character which was decided against them, subjecting them to the payment of a large bill of costs.  The town having refused to reimburse the commissioners, they sued the town for the recovery of the costs which they had been compelled to pay in the first suit.  Judgment was rendered against the commissioners in this suit, by the court of last resort, it having been held that they had no legal claim against the town for those costs.  In 1851, the legislature passed an act authorizing the question of payment to

be submitted to the voters of the town. The voters decided that they would not tax themselves to pay the costs. In 1852, another act was passed authorizing the appointment of commissioners to ascertain and determine the amount of costs and expenses incurred by the commissioners of highways in both suits, and empowering the board of supervisors of the county to apportion the amount upon the taxable property of the town of Guilford, and to direct the collection thereof. The town of Guilford commenced a suit against the board of supervisors and the commissioners of highways, and in their complaint prayed for a perpetual injunction to restrain the defendants from proceeding to compel the town to pay the amount expended by the commissioners of highways in the suits referred to, upon the alleged ground that the law was unconstitutional. The court of appeals held the act valid. (3 *Kernan,* 143.) Dean, J., (p. 145,) after alluding to the limited powers of the federal government, says, "but our state government is an independent existence, representing the sovereignty of the people. The power of the legislature is the power of that sovereignty, and is supreme in all respects, and unlimited in all matters pertaining to legitimate legislation, except in those instances where the people have in their fundamental law, limited or restricted it. Taxation is indisputably a legislative power. The constitution of this state will be searched in vain for any clause which contains any restriction or limitation on the taxing power of the legislature. * * If it is feared that this power may be abused, or if it is in fact abused, *neither the apprehension nor the reality prove the non-existence of the power.*" Denio, J., (p. 149,) says, " the legislature is not confined in its appropriations of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the state. It can thus recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude or charity. Independently of express constitutional restrictions, it can make appropriations of money whenever the public well being requires, or will be promoted by it, *and it is the judge of what is for the public good.*"

The questions which have lately arisen under the prohibitory

act of 1855, and in relation to the validity of certain city assessments, have led to as critical an investigation, and as elaborate an examination by our highest judicial tribunal, of the constitutional power of the legislature over the rights of property, as was ever before bestowed upon that subject in the state. The result of that examination has been, I think, to establish beyond controversy, that the power to pass laws of the character in question in this suit, is a power vested in the legislative department of the government, and may be exercised by that department, unless the constitution prohibits its exercise.

In the case of *Wynehamer* v. *The People*, (3 *Kernan*, 428,) Selden, J., says : " Every sovereign state possess within itself, absolute and unlimited legislative power. While, therefore, the right of a sovereign state to pass arbitrary and tyrannical laws may, its legal *power* cannot be denied. I speak, of course, of a state as a whole, where all its powers are concentrated in the hands of the people at large, or of one or more of its members. It follows, that if a society, or people, wishing to form an organized government, should simply create the three essential departments, vesting the whole executive power in one, the legislative in another, and the judicial in a third, the legislative department could make any law which the people themselves could have made, arbitrary or otherwise. ' The legislative power of this state shall be vested in the senate and assembly.' This means of course, the whole legislative power. The words are general, and unlimited ; nothing is reserved. Why then, as it has been shown that the people could make any law, just or unjust, is not the legislature equally absolute ? It is because by other clauses in the constitution, a portion of this absolute power has been transferred to the judiciary, not, it is true, in direct terms ; but the constitution being the result of legislation by the people themselves before parting with their power, is the paramount law. When therefore, any law passed by the legislature conflicts with this, the judiciary pronounces between them, and the paramount law prevails. The law-making power has, and can have, no other limitation than such as is prescribed by the constitution. *The doctrine that there exists in the judi-*

Benson *v.* Mayor &c. of Albany.

ciary some vague, loose and undefined power to annul a law, because in its judgment it is contrary to natural equity and justice, is in conflict with the first principles of government, and can never, I think, be maintained." (*Id. pp.* 429, 30.) "The remedy for unjust legislation, provided it does not conflict with the organic law, is at the ballot box." (*P.* 432.) In the same case, page 410, A. S. Johnson, J., after remarking, that, in this state, all power is derived from the people, and that to the legislature they have intrusted the legislative power of the state, and after alluding to the restrictions in the constitution upon all the agents to whom they have committed the powers of government, adds, "in my judgment, legislative power is subject to no other control." Hubbard, J., at page 453, after remarking that the grant of legislative power in the constitution is general, proceeds to say, "what this is precisely, is not and cannot well be defined. Aside from the express limitations, it is believed to embrace all the common law power which the legislature would have possessed had the fundamental law remained as in England, a part of the unwritten law of the state." Comstock, J., at page 496, says, "I entertain no doubt that aside from the special limitations of the constitution, the legislature cannot exercise powers which are in their nature essentially judicial or executive. These are by the constitution distributed to other departments of the government. It is only the legislative power which is vested in the senate and assembly. But where the constitution is silent, and there is no clear usurpation of the powers distributed to other departments, I think there would be great difficulty and great danger in attempting to define the limits of this power."

In the case of *The People* v. *The Mayor &c. of Brooklyn,* (4 *Comst.* 425,) Ruggles, J., quotes the opinion of Chief Justice Marshall in the case of the *Providence Bank* v. *Billings,* (4 *Peters,* 514,) in which he says, "the power of legislation and consequently of taxation, is granted for the benefit of all. It resides in the government as part of itself, and need not to be reserved. This vital power may be abused, but the interest, wisdom and justice of the legislative body, and its relations

with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation." At page 126, Ruggles, J., says, "assuming this, as we safely may, to be sound doctrine, it must be conceded that the power of taxation is vested exclusively in the legislature, unless this power is limited or restricted by some constitutional provision."

It appears to me that the second proposition upon which the decision in the case of *Clark* v. *The City of Rochester* is based, is equally untenable, and equally opposed to the principles established by the court of appeals in the cases above cited. The proposition is, that the "*assumption*" and exercise of such a power by the legislature is "*adverse to the spirit*" of the constitution. To maintain this proposition, the learned judge cites the following clauses of the constitution : No person shall be deprived of life, liberty or property without due process of law ; nor shall private property be taken for public use without just compensation. If these clauses were in fact intended to impose any such restriction as is here imputed to them, it is most manifest that their true meaning has not heretofore been correctly understood ; for the former constitutions of the state contained provisions of a similar character, and yet, as has already been observed, there has been a uniform and unvarying practical disregard of their supposed intended restraining influence. The judge also cites in support of the second proposition that clause of the constitution which, in express terms, prohibits the state from in any manner giving or loaning its credit to, or in aid of, any individual, association or incorporation. It is certainly to be regretted, if the framers of the constitution *intended* to impose a restriction upon that department of the government to which was delegated the legislative power of the state, in order to prevent it from conferring upon municipal corporations authority to loan their credit or contract debts, that terms equally plain and unequivocal had not been selected to express such intent. The judge also cites sections 12, 13 and 14, of article 7 of the constitution under this branch of his argument. But as they relate to matters distinct from, and entirely independent of the question of legislative power involved in the Rochester

case, as well as in that pending before me, they have failed to convince me, that considered either alone, or in connection with the other clauses cited, they afford any aid in establishing the proposition they were introduced to sustain. It is hardly to be supposed that in the formation of so solemn and so well considered an instrument, as the organic law of a great state, designed both to confer sovereign power, and to restrict and limit its exercise, so as to prevent its abuse, if its framers intended to place the power in question in the class of restrictions, and not of grants, they should have so concealed and disguised that intent, as to render it necessary to search for it among provisions and restrictions relating to other subjects, leaving it doubtful whether, after the most diligent search, the true intent and meaning had, or had not been discovered. In my judgment, the latitudinarian construction of the constitution to which a search for its hidden and unexpressed meaning would unavoidably lead, would be fraught with consequences far more dangerous and alarming than those which grow out of unwise or improvident legislation.

The duty assigned to the judiciary, of defining the limits and establishing the boundaries of the powers conferred and the restrictions imposed upon the different departments of the government by the fundamental law, for the purpose of guarding against the abuses, and averting the evils arising from the usurpation of power withheld or restricted, is of too delicate and too important a character to be exercised except in cases free from all reasonable doubt, lest that department subject itself to the imputation of transcending the just limits of its own power, and committing the very abuses which it professes to restrain and correct.

Surely, no department of the government is under a stronger, or more solemn obligation to exercise its powers in such a manner as to secure it against affording any reasonable ground for such a charge, than that which possesses and exerts the power of restricting the action of the other departments within the limits of their legitimate constitutional authority, and is itself exempt from any direct supervisory control.

In the case cited from 3 *Kernan*, at page 391, Comstock, J., speaking of the difficulty of defining the limits of legislative power, says : "When theories alleged to be founded in natural reason, or inalienable rights, but subversive of the just and necessary powers of government, attract the belief of considerable classes of men, and when too much reverence for government and law is certainly among the least of the perils to which our institutions are exposed, I am reluctant to enter upon this field of inquiry, satisfied as I am, that no rule can be laid down in terms which may not contain the germ of great mischief to society, by giving to private opinion and speculation a license to oppose themselves to the just and legitimate powers of government." Selden, J., at page 453, says : "I am opposed to the judiciary attempting to set bounds to legislative authority, or declaring a statute invalid upon any fanciful theory of higher law, or first principles of natural right, outside the constitution. If the courts may imply limitation, there is no bound to implication except judicial discretion, which must place the courts above the legislature, and also above the constitution itself. This is hostile to the theory of the government. The constitution is the only standard for the courts to determine the question of statutory validity." T. A. Johnson, J., at page 477 of same case, says : "Should the time ever come when the courts, instead of sustaining and enforcing the legislative will, become forward to thwart and defeat it, and assume to prescribe limits to its exercise, other than those prescribed in the constitution, to substitute their discretion and notions of expediency for constitutional restraints, and to declare enactments void for want of conformity to such standards ; or when to defeat unpalatable acts, they shall habitually resort to subtleties, and refinements, and strained constructions, to bring them in conflict with the constitution, the end of all just and salutary authority, judicial as well as legislative, will not be remote." In the case of the *People* v. *Cowles*, (3 *Kernan*, 360,) A. S. Johnson, J., after speaking of the practice which formerly prevailed both in the courts of this country and of England, of giving a strained and unnatural construction to statutes, to make the will of the law-

makers conform to the better judgment of the judges, a practice which he says has been abandoned, proceeds to remark : " Courts are not responsible that only wise laws shall be made ; they have no power given them to judge of the wisdom of the legislature, nor to revise and alter that which has been enacted to be the law. If these principles are proper to restrain the action of courts in construing acts of the legislature, they certainly, with no less urgency, are applicable to constitutional provisions, which, from their greater importance and more permanent operation, must be supposed to have been framed with the utmost circumspection."

The remaining point of inquiry is, does the constitution *prohibit* the legislature from making grants of power of the character in question ? It has been contended that the 9th section of the 8th article furnishes an affirmative answer to this question. It is in these words : " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment and borrowing money, contracting debts and loaning their credit, *so as to prevent abuses in assessments, and in contracting debts by such municipal corporations."* Justice Allen makes the following comments upon this section : " A discretion is vested in the legislature as to the restriction, but none whatever in regard to the granting of new and enlarged powers, in respect to taxation and the creation of debts." Again he says, " It must be construed as an absolute restriction upon the powers of the legislature in conferring powers upon municipal corporations." If this be a correct exposition of the section in question ; if the legislature are prohibited from granting to municipal corporations, any *" new and enlarged powers in respect to the creation* " *of a debt,* the act passed in 1850, authorizing the city of Albany to borrow money for the purpose of supplying the city with water, is unconstitutional, and the bonds issued under it are void, for it was both a new and an enlarged power ; and it was the necessity for such a power that compelled the city to apply for, and the legislature to grant it ; and it led to the creation of a debt, for under that grant the city issued its bonds to

the amount of $600,000. It is true, that the learned judge had previously remarked, that the legislature might provide by law for all necessary improvements required by a city within the locality, and assess the expenses as a part of the public burden upon the community for whose benefit the expenses should be incurred, and that "this power might be delegated to the common council of a city, for the locality embraced within its boundaries." It is difficult to perceive how all this can be done under the supposed prohibition of the 9th section, for it concedes and necessarily involves the exercise of a *new and enlarged* power of taxation, and perhaps of contracting a debt, and that section makes no provision for necessary improvements, no exception in favor of the wants of *localities.* The only qualification which it contains is, that the power granted is to be restricted "so as to prevent abuse."

To construe the section under consideration as a *prohibition* upon the legislature against granting *any new and enlarged power,* appears to me to involve the incongruity of forbidding them to do at all, what they are explicitly required to do in a particular manner. Ruggles, J., in the Brooklyn case, (p. 440,) in speaking of the section in question says, "the direction given to restrict the power of cities and villages to make assessments, *presupposes and admits* the existence of the power to be restricted." The remark applies with equal force to the restriction of the power of contracting debts; it presupposes and admits the existence of such a power to be restricted. It may be asked, is there no remedy, if the legislature grant to municipal corporations the power of taxation and of contracting debts, and fail to impose the necessary restrictions to prevent abuses in its exercise? I am inclined to think that the character and extent of the restrictions to be imposed is, from the very nature of the case, entirely a matter of legislative discretion, and like all discretionary power, not the subject of review or reversal by any judicial tribunal. The constititution confers powers upon every department of the government which may be abused, and which no other department has the power to review or revise, and which can only be corrected by the su-

Benson *v.* Mayor &c. of Albany.

pervisory power of the people at the ballot box; hence the necessity and the practice of frequent elections, which afford the only forum for the trial and punishment of many delinquencies. Ruggles, J., in the Brooklyn case, p. 432, says, "the remedy for unwise or unjust legislation is not to be administered by the courts. It remains in the hands of the people, and is to be wrought out by means of a change in the representative body, if it cannot be otherwise obtained. The constitution has imposed upon the legislature the duty of restricting the power of municipal corporations in making assessments and preventing abuses therein. To assume that this duty has been, and will be neglected, is a denial of that reasonable confidence which one department of the government ought always to entertain towards the others." Chief Justice Marshall, in the case of *Brown* v. *The State of Maryland*, (12 *Wheat*. 419,) says, "questions of power do not depend upon the degree to which it may be exercised; if it may be exercised at all, it may be exercised at the will of those in whose hands it is placed."

The opinions quoted in connection with the other points in this case will, it is believed, sustain the doctrine that the judiciary have no power to correct the errors of indiscretion, which the legislature may commit in the exercise of the power it possesses.

It might, I think, be conceded that an act conferring upon a city a general power of taxation and contracting debts, was unconstitutional if it contained no restrictions to prevent abuses in its exercise, and yet be shown that the act conferring the power in question upon the city of Albany, was a constitutional and valid act.

It is made the duty of the legislature "*to restrict*" the power of municipal corporations "so as to prevent abuses in assessments and in contracting debt." To restrict means to *limit*, to *confine*. The question then presented is, between conferring limited or unlimited, restricted or unrestricted power. It cannot be asserted with even the semblance of truth, that to confer upon a city the power to contract a debt in a single instance, and for a specified purpose, is conferring unlimited and unre-

stricted power.  Indeed, it is impossible to conceive how the legislature could obey the injunction contained in the 9th section of the 8th article of the constitution, in a less questionable or more unexceptionable manner, than by reserving the general power which they are directed to restrict, in their own hands, and limiting their grants to such single instances, and such specified purposes, as in their judgment shall appear discreet and proper.  To call this a grant of unlimited or unrestricted power, is confounding all distinctions in terms, and an unauthorized use of language.

As the result of my examination of the question involved in this case, I have arrived at the following conclusions :

1st. That the act of 1854, authorizing the loan of the credit of the city of Albany to the Northern Rail Road Company, was an exercise of the legitimate power of legislation.

2d.  That the exercise of this power was not " *adverse to the spirit*" of the constitution, so as to authorize the judicial tribunals to declare it void.

3d.  That there is *no prohibition* in the constitution, against the exercise of such a power by the legislature.

4th.  And therefore that the remedy for the evils which a large and respectable class of citizens believe to grow out of grants of power to municipal corporations to loan their credit, is not to be found in appeals to the judicial tribunals, but must be sought through other channels.

Motion denied.

[ALBANY SPECIAL TERM, April 22, 1857.   *D. Wright*, Justice.]